The first case this morning is in the range of Shinohara. Your Honor. This is a court of martial law. My name is Bill Thompson. I'm counsel for the appellant, Shinohara, in this case, and for the attorney of the application, Attorney for Trinity Laboratories. This is the first time I've had the privilege of arguing before this court, so I apologize for the nerves that I may display. The issue before us today focuses on an obviously tight double patent, and on what role and to what extent a specification of a patent underlying an obviously tight double patent rejection can be relied upon. The appellant believes in this case that the position of the patent office goes grossly beyond what the law allows, by effectively reading into the claims of the underlying patent specific limitations from the specification. We further believe that the petitioner's brief proposes... I'm not sure that's what they did, that they were reading into the claims limitations from the specification. It's a little unclear as to what they were saying, but I don't think they were saying that the terms of the original patent in fact included the additional steps. I think they're saying that the preferred environment had the step in it. Yeah, I think it's your honor to understand, the underlying patent on the double patent rejection includes a step of forming a plurality of TFTs. The application that's pending before us today includes two relevant steps, I think, which is removing a silicon oxide layer and a very similar forming a plurality of TFTs. In 856, the underlying forms the film transistors by removing that layer. And as a matter of fact, there's no way to form a transistor of this nature without removing that layer, is there? Yeah, I think there is, your honor, and I think that we've cited some evidence that... Why? What could you do? The layer that's being focused on with respect to the semiconductor, the silicon oxide insulating layer, is removed in the preferred embodiment because it results in a device that has particular advantages. It's not necessary, and I think we pointed this out when we cited the Yamazaki patent, which is a record in the case, at the appendix 1741 to 1760. And the Yamazaki patent discloses a method of forming a thin film transistor that doesn't involve removal. But this patent does, right? Every embodiment of the process here, which is referred to as the second embodiment, the manufacturing embodiment, involves a removal step, right? I believe the detailed description of that embodiment involves removal step of, alternatively, and this may be important, silicon oxide or silicon nitride. So there is a detailed discussion. There's also a detailed discussion about the thicknesses of the layer. There's no suggestion in this patent specification that this manufacturing process can be performed without including a removal step, right? Other than perhaps at the end of the specification, there's a generalized discussion, I believe, that it's described with particularity and for the best note. But what I think is the important factor here for the appellant is the patent laws are to encourage complete disclosure. That's what we want.  not less in the specification. We're looking at one specification here. We've got figure 7B and 7C, and the layer we're removing is that 59, right? Figure 7B? Figure 7B, yes. And the 1.7 is claiming, specifically, removing that 59 layer. Correct. Now, how could you get to 7C, which is the final semiconductor, without removing that layer? The layer is gone in 7C. Yes, in this preferred embodiment, it is gone. But the layer that we see in 7C, which is designated as layer 53, is a gate insulating layer. And gate insulating layer 53 is disclosed in column 6 of the patent and in line 11 has been made from, for example, silicon oxide. So in this particular embodiment, during the laser irradiation So you're just going to leave 59 in place and throw your 53 over the top of it? That would make a perfectly acceptable transistor. But it's not going to give you 7C, is it? Not the way it's illustrated here. No, it wouldn't give you what you disclose. The film transistor claimed in 856. Now, perhaps there could be a broader definition of that film transistor. Well, in that the layer 59 and this layer 53 are both silicon oxide, and the thickness of this layer 59, of course the patent specification drawings are not necessarily the scale. And, in fact, during this later laser radiation process, this silicon oxide layer 59 may be inadvertently formed. And that is the point of removing it, so that we can have a cleaner surface on the top of these I-158 and thereafter form this gate insulating layer. Yeah, and ask this in legal terms. How is this gate different from Schneller? A number of different ways that we believe. First of all, I'd like to note that we don't feel Schneller is finding precedence on the court today necessarily. Wow. We think Schneller is not a majority opinion, but it's cited by a plurality of the judges, so we're not sure that it's binding. We believe it may be supportive precedence, but not binding on this court. Schneller itself cautions against the use of the principle set forth in NERSC generally. I don't understand what you're saying. Why is this a plurality opinion? Well, Schneller says it's limited to the fact that I don't have limited time. I'd really like to take this in a new direction. Okay. Because there's something very strange about this prosecution, about these rejections. Is it your understanding that if you had agreed to a terminal disclaimer that we wouldn't have this question? It's my understanding that a terminal disclaimer would overcome the double patent rejection, yes. That would have been the end of it? Yes. Okay. So, from that viewpoint, then the issues really are different than the other issues, because you then, not agreeing to the terminal disclaimer, have taken the position that these are not obvious, one view of the other, as would involve a terminal disclaimer, and we don't have a question. But that there is, in fact, a second invention here, which devolves from the patent specification. Yes. And let me make sure that the facts are very clear on that. We file hundreds of terminal disclaimers, perhaps in a given year. The reason in this case we can't do that is this case is 17 years. Yes. This case is entitled to a 17-year term based on the provision to the rule that was changed in 1995. And the underlying patent, the 856 patent, is expired. So, if we were to file a terminal disclaimer, effectively the patent would be expired if issued by the Patent Office. And, again, ultimately the reason that I'm here today is we had no other choice. This is our last step. We can't RCE this case. We can't file a terminal disclaimer. There's no other option for us. But you could certainly disclaim the term of the patent that extends beyond the term of the parent, whether it's entitled to 17 years or 20. Yes, we could do that here, but the practical effect of that would be a patent that has no term left upon issue. It's always expired. Exactly, which takes us into the substantive issue of what is discontinued. Right. Okay. And looking again at the next kind of issue, the 127 claims an insulating film that covers the surface between the islands, the gaps, right? The 127, yes. And the 856, the parent, claims islands and then the insulation covering the entire surface, not specifically related to covering the gaps, although that's what's shown. But, again, to work, the insulation has to cover the gaps, right? I don't believe that that's necessary that the insulation would have. This one is a little tougher for you to say that, isn't it? But if you don't have insulation between the gaps, those two gates short each other out. You've got to have insulation between the gaps. The 856 says it's covering the entire surface. That's, of course, the gaps and the tops of the islands. And your 127 just says it insulates the gaps, but isn't that a necessity, an inherent property that has to exist? I don't believe it is a necessary or inherent property, and I think that the concern here is that... How can you work with the two islands exposed to each other? Well, I don't believe that the final result of the ultimate device is shown in this patent. There may be passivation layers, leveling layers, and other things that are formed here. And I think that it's important to remember in context that this patent is directed to a laser processing method. The primary focus here is on the way that the laser is used. And the subsequent steps of forming the TFTs to complete the device really wasn't where the focus, the point of novelty was in the original disclosure. So there's some... But you're claiming here an apparatus, not a method. So these features we're looking at are what you're claiming. Yes, I agree with that, yes. And I think that... The fact is the 856 really covers the embodiment that you're seeking now to claim with your 127, your later one. Well, the 856 is an identical disclosure to what we have in our case, and so... So it's a dominating. That's the Schneller situation where you've got the dominating. Well, but I don't... I think we have a significant case law precedent that domination alone is not Augustus type dental patenting. What you can do is to describe the invention of the first patent in a narrative way, and then try to get a new patent term by adding a limitation that was present in the embodiment in the first place, right? I wouldn't agree with that. Let me give you a hypothetical. Suppose somebody invents a car with an engine and a chassis, okay? The first patent just describes the engine and the chassis. It doesn't say anything about the wheels. Wouldn't it be suggesting that you can file a second application adding the wheels as a limitation, and then getting a new 17-year term? If the wheels are unobvious over the... My hypothetical is part of the original invention. The single embodiment describes the single embodiment. The wheels are there. You can't just leave it out in the first patent and then get a new 17-year term by listing it in the second patent, can you? I think you can, yes. But it was an improvement patent. This is the exact... There's no greater improvement here. We had something that vastly enhanced the automobile's efficiency because of a new kind of wheel that doesn't touch the ground. It's magnetic or something. Yes, but you don't have that. You're claiming here exactly what was in the earlier one. Is there any improvement? Is there any advance in the art that would give it, as Judge Newman suggested, a right to a new patent or a new invention? Yes, I think there is. I'm very short on time, and I wanted to reserve... Please, go ahead. We'll give you time. Okay, thank you. What is your invention? I think the invention here, and this is the first point I want to make, is how we define the term invention. Is it what's disclosed in the preferred embodiment? And has it been implemented? A reasonable improvement. Something which is not obvious over the parent. Over the parent. Over the prior art. Right. And in this case, I don't think the specification in this continuing application is necessarily prior art. Our improvement is telling someone that in addition to forming the priority of TFTs, you should remove the silicon oxide layer 59 that occurs. We disclose the presence of the layer. We disclose that it's formed during this process, and we tell you before you just proceed to form your TFT, which is what Yamazaki was doing, what the prior art was doing prior to our invention. We tell them, remove it first, then form your gate-insulating layer. Let me interrupt you again. I think that you are absolutely correct in your discussion of the law of double packaging. And it needs to practice, and that's what has changed dramatically since I became a judge, is that you kind of describe things broadly in your initial specification. And here or there, whether it was restriction requirements or additional information, you are claiming different aspects in different, moving forward with the same specification, without having your own disclosure side of the game to do. That's different, however. Then we get to the law of double patenting, where if, in fact, in the first case you have patented the same thing, you can't patent a second one. You mentioned at the outset that the dominating patents are symbiotic, where the exclusions often are included in separate patents on the identical specification, without having the generic concept side of the game to do. And there is a dark spot where it is accepted that these are essentially separately patented inventions, unless one is obviouser to the other. And the claims, the concerning of the claims, not of the specification, where I have trouble, and where I think they also have trouble with your disclosures, is the concerning of the claims, not of the specification. It's still looked as if one was an obviouser to the other. Looking further at the claims, I think that this accepts without trying to put a spin on the glass, on shattering the complexities of double patenting. Why, in your case, as Schneller said, this is very case specific. In your case, why, in fact, you are not patenting the claim, the same thing, in fact, that one claim might last 17 years longer than the other one. It weighs against, I think, the level of meaning of the claims, rather than the fact that you just happen to be in that transition. Otherwise, you wouldn't be where it's held because you have no hope for a second patent, because everything you've done since 1992 will still be there. Yeah, and I think that this is an unusual situation, because of the change in the law, that's not likely to occur. But it represents as if one is trying to gain that situation by putting 17 years on top of the expiry. Yeah, and I'd like to point out a couple of things about that, one of which is this case. Why don't you point that out when you come back from rebuttal. We'll give you two minutes for rebuttal. Okay. And let's hear from Mr. Kelly. Thank you, Mr. Kelly. I'd like for two minutes to begin to use it. We would be helpful to hear as well if you could point out whether, in fact, the office is saying some very strange things about double patent. But I can see, nonetheless, that applying the same thing with the office would have problems. Good morning. I agree with you. We wouldn't be here, as counsel said, if the first patent hadn't expired. Just a way to say that is we wouldn't be here if he hadn't figured out this way to manipulate the system a little bit to get another patent on what he thought would be covered. Well, that's because of law. I think maybe they're entitled. Fair enough. If they're entitled, they may be entitled. The problem here is, Your Honor, they've already claimed in the 856 patent what they're seeking to claim in the 127 patent. And I'd like to discuss the figures, the technology that's going on here, if I may, for a second. Can I clarify one thing? Sure. You're not asserting that the claims of the 856 should be interpreted as including a digital step, are you? Well, they need to be interpreted to include a forming transistor step. And that alone is not a step. And what the board did is they looked into the specification to figure out what forming transistors means in the context of this invention. I'm not sure you're answering my question. It seems to me there are two different arguments that you could be making. One is that the claims require a removal step. The other one is that while the claims are limited to a removal step, that that's an essential part of the invention and the embodiment of these claims, and therefore has to be considered as part of the invention in determining the double patent action. Would you understand the difference between the two? Yes. And I think we're closer to your second example. Because what the board did is they looked at the spec and they said, this invention requires the removal step. Practicing this invention, making this embodiment, if someone's going to be in the field and they're going to adopt this teaching and incorporate it into their production facility, they're going to have to remove that insulator. And that's the only embodiment that's disclosed in the specification. It's the only embodiment disclosed in the specification. And I'd like to discuss a projection. But that's where I think Judge Newman and I have a little bit of trouble with the way the board reasoned this. Because they jumped rather quickly to that spec, didn't they? And started to talk about what the specification tells us, rather than sticking with the law, which is claims to claims, as crazy and difficult as that may be. Well, I don't think claims to claims is exactly a correct articulation in light of cases like Verbo to tell us. Sometimes it's a little nonsensical to claim to compare one legal boundary to another when doing an obviousness analysis. It's the only way you can do it. You can't cite the specification against this continuation. Unless the claims are obvious, whether it's the mother or the mother-in-law, then they're entitled to the claim. You can't cite the specification. In fact, they are entitled to the claim. It's just a matter of the length, the period to which they're entitled. There's nothing wrong with double patenting in return for the disclaimer. I agree, Your Honor. And I also agree that you can't cite the specification against patentee in a later application. But you can't do it when you're citing it as prior art, when you're citing it as a teaching to move away from what was claimed earlier. You can cite it, perhaps, to construe the claim. What's the difference between citing it as a teaching and citing it as prior art? I don't think there's any difference between those two articulations. I do think there's a difference, respectfully, from cases like Anne-Marie Vogel that says, what you need to do is figure out what was claimed the first time, what the invention is. And that's where it comes in. The invention is still construing the claim. What we're really trying to find out is whether this second thing is reclaiming what they had the first time or actually claiming an improvement, a patentable improvement, something which really deserves a new term, a new patent, a new advance. Well, it wasn't an advance here, Your Honor, because there was no new application. There was no presentation. Yes, and I think that we are all comfortable with the notion that when someone discloses and claims a patent, a first invention, that further innovation can take place, further science, further clarifying or improving that invention, and you get to a narrower invention. And we're comfortable with the concept of two patents that might issue of some overlapping scope, but nevertheless the second patent is to a new invention or a new innovation. That is not what happened here. They've recited one single method of producing a transistor, a method that they've made clear to the board, to this court in the briefing, and now here today in oral argument, there's going to be that opposite later. That opposite later. I agree with my hypothetical based on the car, that the invention is the chassis, the engine, and the wheels, and that they choose to write the claims in the first patent just to mention the chassis and the engine without mentioning the wheels, and that they can't come along and get a new 17-year term by specifically mentioning the wheels the second time around. Yes, that's shown. That's what happened in Canada. So you have a scenario where there's a single invention disclosed. Well, so what you would have is a scenario where the office would say, no, this is the initial restriction requirements. They would require the applicant to file, pay another fee, start all over again, and claim the wheels separately. The way the process has evolved makes it extraordinarily difficult to complete, which is why I'm concerned about the board saying one patent for an invention, and at the same time we see case after case where there are restriction requirements or other issues that arise in citations and different references. The applicants are obliged to file separate applications, and now we're saying, well, it's too bad. We've got you going both ways. Really, we're talking about something incredibly complex. The complexities have arisen because of patent prosecution, the rules, the changes in the law, and Your Honor is correct that many times when someone claims everything together, when someone claims Judge Dyke's car all at once in different modifications, they may get restriction requirements. And as this Court is well aware, there's a protection in our law that would protect against a later double patent rejection. The problem is we need to go through that step. It's not pro forma. If he's got multiple inventions, he needs to claim them up front so that the office is at least given an opportunity to consider whether there are independent and distinct inventions. And if a restriction requirement is made, then it can be made, and then we can have a scenario where they will get their multiple dependents and we will be stopped from making a double patent rejection. But as in Schneller, there's no restriction here. There couldn't have been a restriction here, Your Honor, because they didn't recite these different claims. Now, what's the burden on to show that there is a distinct, independently patentable improvement? Well, any rejection, Your Honor, the burden is in the first instance on the United States Patent and Trademark Office. When you say this doesn't, we see no new invention here, we reject you, does the burden shift at that point to then you come back and say, here's the new invention, here's how it works, it deserves a patent? Yes, and particularly when you have a fact scenario, which is on all thirds of the case, like Henry Schneller, which of course is binding precedent on this court. This court has already held as much in an earlier case. But when you see that happen, we have this exact fact scenario. We need to move forward. We need to write the rejection. And perhaps in some instances there will be a restriction requirement, but we need to go through those motions as they might appear on the outside in order to ensure that the system operates at least as it's designed to. And I want to talk for a second about a rejection that was made in this case and withdrawn, and I think it speaks to the technology here and why the removal step is really always taking place, maybe apart from the claims, but in reality when you practice this method. They didn't come to the patent office in the second instance with this claim with the removal step in it and say, I've got a new invention. They came with basically the same claim again without the removal step in it. That's when they first got their double patent rejection. That's when they needed to get around it in order to get their second patent. That's when the removal step came in. The examiner rejected that removal step as indefinite, and she said, I don't understand how you can remove a layer that you haven't put down yet. I've seen in your specification you put down a layer and then you remove the layer, but now you're just citing removal without adding, and that makes no sense to me. And what he told the board and what he said in his blueprint, page 6, and I think what he said here this morning is, that oxide layer, that occurs. That's part of my process. He takes an amorphous silicon ion that he's placed down and irradiates it with a laser at a very high temperature in order to warm it up to allow the atoms to essentially snap into their crystalline form to crystallize it. And in doing that, as he pointed out to the board, an oxide can naturally occur on the top of that ion. So maybe in one instance, in what he described in this fact, he puts down an oxide layer so that when he shines the laser through it, the top of the semiconductor won't further oxidize. But if he doesn't put down that oxide layer, it's going to occur naturally during the manufacturing process. He's got to remove what's ever there on top. Now, what he said this morning was, well, you could theoretically just leave it on and keep building transistors, and it would probably work. In fact, it might have all the parts of the transistor. It might have a source, a gain, a channel, a gate, an oxide layer. But I submit to the court that it wouldn't work as intended because these devices have to be made to incredibly strict tolerances. He can't rely on a naturally occurring oxide layer to provide the very specific gate oxide layer that he needs. And the one thing I'll add is he's pointed to a Yamazaki patent repeatedly, and I'm not sure why because that patent is six years after his patent. So he's not pointing to a prior method. He's pointing to a future method six years later. The miter might not make the device without removing the layer, but the point is it doesn't make the device with his patented method, which apparently results in an oxide layer naturally if he hasn't put one down already. So in essence what we have is we have a case where, due to an anomaly in the law, due to his filing dates, he came back to the office because he was able to put in some claims that cover, again, the invention that he's already had his full statutory term for. He's already had exclusivity for this invention. It expired in, I think, 2007, and now he's able to claim it again. And he shouldn't be permitted to do that. That's precisely what this court's federal patenting doctrine is meant to prevent. If this court has no further questions, I'll yield the remainder of my time. Thank you, Mr. Kelly. Mr. Watson, we'll give you back two minutes. Two minutes. Thank you. First thing I want to make sure I say, there is a restriction requirement in this case. You can find it in Appendix 1030. I have a copy here if the court would like to see it. And certainly we want to note that this restriction requirement does talk about silicon oxide. It does talk about silicon nitride, laser crystallization, semiconductor films. There's seven different species that are set forth in this restriction requirement. Once the board, the court, the examiner rejected your second-claiming effort, didn't you have a responsibility to show that you had an improvement, that you had something that deserved an independent, all-matters, 17 years of exclusivity? Certainly, Your Honor. If there's a prima facie case established, the burden is just to us to rebut it. We don't believe there's a prima facie case here. You have attacking the prima facie case. You're not making any effort to show that you have an improvement patent. But we have made some effort. And what's really important that I think I want to say here is we have evidence of unobviousness. We have a restriction requirement. We have the Yamazaki patent, which goes back to an earliest filing date of August 25, 1993, not six years after this case. So we provided some evidence in the record. But rather than doing, as the solicitor has asserted, of trying to determine if this is obvious or not and finding evidence of it and presenting it, they ran immediately to the specification and took an entire paragraph out of our specification and said, forming TFTs, and let me say, I told you earlier it was an apparatus, I misspoke, it's a method claim, so I apologize for my misstatement. They took this entire step of forming TFTs and said this means this entire paragraph. And then they selectively chose from that that it means silicon oxide, not silicon nitride, which is disclosed in the alternative. There's no evidence in the record other than the fact that I pointed out earlier. I'm sorry, I'm out of time. Tell me something. Thank you, Mr. Roberts.